May it please the Court, my name is Jennifer Goldstein, Counsel for the EEOC. Your Honors, there is evidence in the record that SCS did not provide Centennial with an effective accommodation for his deafness in several areas. But in particular, they did not provide him with an interpreter to help him understand and participate in accounting department's weekly meetings and for several years their monthly meetings. Now I'd like to focus on the meetings because legally EEOC and SCS have framed the issue in a similar way, namely was the note writing that they used effective for Centennial? But I would like to address the factual arguments in their brief because I think they create a misleading impression about the record. Now SCS argues that Centennial was just fine with note writing during meetings, but there is considerable evidence that note writing was not effective for Centennial. On page 14 of their brief, they say that the only problem that he had with note writing was that it was slow, and it's certainly true. There's considerable evidence that note writing never kept up with the pace of conversation. He said, hurry up, hurry up, and the note writer would say just wait, just wait. That's page 63 of the record. I do want to talk about the record and I do want to hear what you have to say, but it would help me in assessing what you say if we could talk about the standards that's applicable. This is always what appellate courts do, they look at standards. Specifically, to what extent is Mr. Centennial's subjective unhappiness a relevant factor? Let's just subtract from this case and say an employer provides an accommodation that by some objective standards you would say is perfectly fine, but the individual says, look, I'm just not happy with this. I don't want to use a wheelchair, for example. I just don't feel comfortable in a wheelchair. Just to use that as an example, I want something where I'm able to avoid that, or I'm not happy with notes. I really feel more comfortable in sign language. To what extent is this something that turns on his personal subjective happiness, and to what extent is this an objective standard? I think it is more objective, and it's certainly true that an employer doesn't have to provide a preferred accommodation as long as there's another accommodation that meets the individual's needs. In fact, in this case, Mr. Centennial was willing to try note writing. He did try it for some time, but what he found was that it wasn't effective for him. It wasn't helping him understand and participate in the meetings. He says that. He was obviously unhappy with the note writing, but if we sort of look at the notes, the notes said everything that was in the meeting to be said, and he didn't get it as quickly or in quite the way that he would prefer, but he got that a reasonable person, a disabled individual in his situation, would have gotten the gist of what was going on. I think there were three problems with him. I think the slowness meant that he couldn't participate actively and made it much more difficult for him to ask questions because he wasn't getting the information at the same time. I think the second... Incidentally, how would he ask questions if there was no interpreter? I believe he would scribble. He didn't ask questions, so I think there's nothing in the record. Right, but he would then have to write a note. I believe so. Okay, right. There's nothing in the record on that. The second problem, and STS actually acknowledges this, was that note writing never captured every word. On page 63, he said it's limited. They would just write short words. They never conveyed everything that was going on in the meeting. The final problem was that... And I would say that these two problems on summary judgment would be enough to state an issue, a factual issue as to whether note writing was effective. But there was a third, very fundamental problem, which is that he had a very hard time understanding written words. English is not his primary language. He said there was evidence that he often couldn't understand what was written and couldn't understand what was going on. At page 62 of his deposition, for example, he said, Chan typed up an e-mail about the meeting, but I didn't understand it all. Now, STS argues that they thought that everything was fine, that he never told them that he had a problem with the note writing, but there is considerable evidence in the record that he did convey that he really needed an interpreter. He wrote his initial letter to Schultz and Chan in 2002 saying he needed the interpreter. He told them several times thereafter that he needed an interpreter. And there's evidence that STS knew that note writing was a problem. Chan, on page 202 of the supplemental excerpt of record, Chan acknowledged there were many occasions when Centennial didn't understand her notes. And there's evidence about the HR official who testified that she thought that note writing was absolutely not sufficient in her words, and that it was her strong recommendation that they provide an interpreter for meetings. Now, Schultz rejected that recommendation, and there's no evidence as to exactly why she did. But at the same time that Schultz, in fact, knew that his English skills were poor because she had indicated in his performance evaluation that she thought he needed to improve that. Now, STS argues that Centennial frequently uses note writing in his daily life, which suggests that he didn't have a problem with note writing. I think there are several problems with that argument, the first of which is that it's misleading. They talk in their brief about how he used notes with his stepfather, but the evidence shows that he only used notes with his stepfather. I would have thought you'd be arguing that that is a fact question. Thank you. That would have to be the side of my tire, a fact, right? Yes, thank you. Thank you. You're absolutely right. There is conflicting evidence in the record. You're absolutely right. There is evidence that indicates that he only used notes with his stepfather, and again with the therapist as a last resort, that he had a difficult time with it. And I would just like to point out, before I save the remainder of my time, that when he was disciplined in 2005 for violating the harassment policy, they gave him a written warning and met with him without an interpreter, and he underlined the words in that that he didn't understand. And he underlined, and this is at page 303 of the supplemental excerpts of the record, he underlined investigation, inappropriate, gesture, conduct, forbidden, improvement, repetition, continuation, disciplinary, interpretation. After he did that, later... And he also underlined termination? He did underline termination, yes. They tried to help him at the meeting explain to him what these words meant. They were unable to. He later went home and talked to his mother about it, and she said, I can't believe you had signed that without an interpreter. So he wrote a letter to them saying all this. And they did, for that meeting, eventually get him an interpreter, although a short time later, when they gave all employees a questionnaire about harassment, and he indicated he couldn't understand more than half of the questions, true-false questions, they never got him an interpreter for that. I would like to save that. Good morning, Your Honors. May it please the Court, my name is George Abel, and I am representing UPS Supply Chain Solutions. The key standard to review in this case is the effectiveness of the accommodations that SCS provided to Mr. Centeno. And the key question is, did he convey to SCS that the accommodations provided to him were not effective? So you're conceding that they weren't? No. Then why is the key question whether he conveyed? Well, because the employer provides accommodations, and the employer had the understanding that those accommodations were, in fact, effective and were providing the benefits and privileges of employment to Mr. Centeno, and he never conveyed otherwise. And that is a key question, and it's important to distinguish that between what he's saying now and what he said, what the EEOC argues in its brief, which is that, well, the dictionary, for example, wasn't helpful. He never conveyed to the company that the dictionary wasn't helpful. Or now they're arguing this note-taking wasn't effective, I didn't really understand it. He never conveyed that he understood or that he didn't understand the note-taking. And it's important to recognize that the accommodation that the company was providing to him was, in fact, effective. He was provided with the information in a way that the company understood him to understand, because he Let me make sure I understand your argument. Let's say the accommodation, in fact, was not effective. Let's assume that's the case. Okay. You know, if we look into it, we could determine, or a tire factor could determine that it was not effective. But he fails to explain that to the employer. Is it your position that notice to the employer of the ineffectiveness is part of their prima facie case? It is, Your Honor. And I think there is case law that says that you can't expect an employer to be clairvoyant as to whether a particular accommodation is effective or not. If it appears to be effective, and there's reason for them to believe that it's effective, and here are the reasons for them to believe that it were, that his accommodations were effective, is that he regularly engaged in note-taking and communication through written English, then there's no reason for the company to believe that it was ineffective. In what case? That is the I mean, it sounds plausible. I'm not arguing with you about it. I just Yes, it's cited in our brief, Your Honor, and I can locate it. But the argument is that if the company is not aware that it's I can't locate it.  Okay. Well, if you can't find it, do you want to send us a letter? Yeah, it's actually a follow-up, if I could, Your Honor. I had sort of thought if you were, that was your opening point in your oral argument, you would have looked at it last night and have read the case and could cite each chapter and verse and tell me that Judge Fletcher opened the opinion, for example. That's what we, but okay, I am a little surprised. But I apologize, Your Honor. You can be sure to know this is a question hanging there that you, I would like to answer. But go ahead. Okay, Your Honor. I have one question, Mr. Abel. Yes. Didn't Mr. Centennial testify that he told Chan that he did not understand the contemporaneous notes? And if he did testify in that manner, why doesn't that create a genuine issue of material fact as to the effectiveness of the accommodation for the meetings? Well, the testimony that you're referring to, I believe, Your Honor, is the excerpts of record, page 52, where he, in his deposition, said that at some time after 2004, he told Chan that he didn't understand the notes. He does not say when he communicated that information, and that contradicts his own testimony in that deposition where he said that the only problem he had was that the notes were slow. When he was asked if he had any other problem other than that they were slow, he said no. And so that contradicts the allegation that he told Chan that he didn't understand them. Moreover, You said ER 54? ER 52. You'll have to remember that line. It's lines 3 through 6, Your Honor. 3 through 9 for the entire portion that's relevant. And that contradicts what he says at ER 64. Well, he says he said so after 2004, but he can't remember when. Right. That's what he says. Yes. And what do you get out of that? I get out of that, Your Honor, that it's not clear, one, when he said it, or, two, what, in fact, he said. The question was whether he understood her handwritten notes. It's not clear whether this was on one occasion or on every occasion, and I think for the EEOC to establish its pre-nuffracture case and create a trial question, it has to show that he communicated that this note-taking process just wasn't working. Not one instance. If there were, sure, there were instances where he may not have understood. Jenny Chen was a note-taker. Correct. And you're not taking the position that telling her was not good enough because she wasn't a supervisor. Or was she a supervisor? She was his immediate supervisor. Oh, she was his immediate supervisor. Okay, I missed that. So if he told her, that would have been kind of management. If he had told her that the note-taking in its entirety was not an effective means, then that would have been sufficient. But what he's not done, and what this evidence does not establish, is that he did not convey that the note-taking in its entirety or as a process wasn't working. Sure, there were instances where on a one-off basis he may not have understood a word here or may not have understood a sentence there, and the company worked with him in those instances. The evidence in the record shows that they would meet with him to talk about what he didn't understand. Counsel made reference to Ms. Chen noting instances where he didn't understand her notes, and she would meet with him, and if that wasn't satisfactory, then they would bring in an interpreter to help him understand. And so the focus really needs to be on whether the process of conveying the information was effective. Didn't Ms. Chen agree that her written summaries weren't always complete and that Mr. Cedeno could not always ask questions based on the written summaries? No. The evidence is that she regularly provided him with the opportunity to ask questions about the summaries she provided, and the evidence is also he admitted that he never took advantage of that. So there were opportunities. If he didn't understand a written note provided to him by her, he had the opportunity to go back to her and say, look, I don't understand this, can we go through it or can you get me some additional help? And there was that opportunity that was provided to him. What about the meetings where he did not have a note-taker sitting next to him, which I believe Ms. Chen also indicated that that was true on occasion? Yes. He requested that the person sit next to him in about the middle of his time frame. Prior to that, what had happened, the process was that he was provided with an agenda ahead of time. He was provided with subsequent notes either interlineated with that agenda or a summary of what took place at the meeting, and that was either handed to him or emailed to him, and he was provided with the opportunity to ask questions about what took place. And that was a sufficient way of conveying the information. There was no understanding from the company's viewpoint that he could not understand it, and in fact, if there were instances where he couldn't understand it, he had the opportunity to go back to the company and say, I don't understand this or that. Is it your position, focusing for a moment only on the slowness of the note-taking, that even assuming, for the purpose of this question, that the note-taking was sufficiently comprehensive that he could understand pretty much everything that went on in the meeting, but that it was so slow that he couldn't participate properly? Is it your position that not being able to participate due to the slowness of the note-taking, that that doesn't matter? That is our position, Your Honor, because the slowness of it does not deprive him of a privilege or benefit of employment. So participation in the meeting is not a privilege or benefit of employment? Well, participation in getting the information and being able to interact about that information is the privilege or benefit. He has that ability through the note-taking process. If it's not instantaneous... So even if effectively he cannot ask questions during the meeting, in your view, that doesn't matter? If he's permitted to ask questions thereafter, then that's... After the meeting is over? Correct. In your view, that's enough? That's correct. I believe that's an immaterial distinction, and as long as he has the opportunity to provide or ask questions and interact about the material he's provided, that satisfies the company's obligation under the ADA. You're not taking the position that the meetings were not a part of his employment? He was required to go to the meetings? The manager expected employees to come to the meetings up until a certain point, and then after a certain point... He asked not to, and he was told he got to go. That's not right? Initially, yes, but thereafter he was permitted not to attend the meetings with no consequence to his employment. I think they called him insubordinate at one point for not coming. There is a notation on a form that says insubordinate, but when he filed his declaration in opposition to the summary judgment motion, he states that he was not told that he was insubordinate. Oh, I see. So it's a secret note that he was insubordinate? No, I wouldn't call it a secret note, Your Honor. I think it was a note that perhaps his manager made to herself, but it was not conveyed to him. He didn't understand the word. It was written, and he didn't know what it meant. There's not evidence of that. I just want to sort of understand the thing about the meeting. You do agree, or there's no dispute on the point, that the meetings, whether you were required to attend or not required to attend, conveyed information that was necessary and important to doing one's job properly and getting all the benefits of employment and so on, right? These were not social chats, right? There were business-related information was being conveyed in the meeting, right? Business-related information. Information related to the company was being conveyed, not necessarily about his job or his performance, but about information about the company, and I think it's the key is that the information is the privilege and benefit in receiving that information. This was on employer time. Correct. I mean, the employees were paid salary or wages or whatever for the time they spent at the meeting. I don't know if that's in the record, but that's an assumption we can make, I believe, yes. Okay. Okay. So I think the importance, I think, is to I'm out of my time. I'm happy to continue. Well, I think we understand your position. Thank you. Okay. Your Honors, we do believe that being able to participate in meetings where employment-related matters are discussed is a benefit of employment, and we cited a Fourth Circuit case and several district court decisions. Well, but if he is able to get the information, let's say in written form, or in some way that he can understand, he doesn't even have to be at the meeting present, and then he's, insofar as asking questions, he can ask questions afterwards. Why isn't that good enough? Well, it could be. I mean, I think, just to go back to the point you made, actually, on summary judgment, though, there's enough evidence in this record to show that for him it wasn't effective, that he wasn't ever able, because of his limited understanding of written English, he wasn't able to understand Chan's notes, which both she acknowledged and he said as well. And he felt, especially after he stopped attending, he felt that he could never ask questions. So I think there could be a case in which that would be sufficient, but in this case it was proven insufficient and ineffective. What about the notice of the employer issue that was in Council A's, whether he let the employer know that this was not effective? First of all, is that a requirement? I think so. I mean, I think there are several cases, and to be honest, because that wasn't really in dispute. I didn't, I'm not, it may be the Humphrey case that discusses it, but I'm not, the interactive process. There is a requirement that both, I believe it is Humphrey, that both parties engage in an interactive process. And so an employee does have an obligation to let the employer know about his disability and what accommodations might be. Well, I wanted the case in part because I wanted to be able to look and understand what, I'm perfectly willing to believe there's some such obligation on the part of the employer, but so how much you have to tell is something that would be sort of useful to read what other cases have said about this. But in any event, what is the evidence here on that point? I'm sorry, on which point? On the notice point. Okay. Yeah, well, there's evidence both from him and from other people. The evidence from him was the letter in August 2002 where he said he felt that he needed it. That's at page 67. He said several times after 2002 that he needed an interpreter. On page 50 he said he told them several times after 2004. I'm sorry, these are ER, sorry? ER, I'm sorry, yes, ER. On ER 51 he said he sent several emails to Chan saying that he needed an interpreter at weekly meetings. He also said that, reiterated that point on 53. He said on page 52 of the excerpts of record he said the question was, did you ever tell Chan that you didn't understand her handwritten notes? The answer, yes. And Chan on page, this is the supplemental excerpt. I'm sorry. Your point makes a point. I think there is some validity to it that sort of telling somebody on one occasion or perhaps on isolated occasions I can't understand your notes is sort of like my law clerk saying I can't read your handwriting. But, you know, somehow they manage to slide through it on a regular basis. Once in a while they really can't read it. So the difference between saying the process isn't working at all and saying, you know, this particular note. So I'm just wondering what is it that, where is it that you have evidence that he gave notices, look, the process, the note-taking process doesn't work. Well, I think he tied it to an interpreter. He said that I'm very bad at English and, I'm sorry, let me get the, I think in all those pages he said he doesn't understand and that what he needed, this is again at page 51, what I need is an interpreter because my English is bad. And I would say, again, this is on summary judgment. I think there was an understanding on the part of SCS of this because you have the HR official understanding that note-writing was not. Let me ask you this, if I may, continuing on the note-taking part of it. Putting to one side the question of timeliness, that is to say that they're slow, putting to one side the question of his not being able to understand all the words that might be written, this is an additional question I have, and that is, do we know how complete the notes were? That is to say, if we have somebody who takes shorthand, the notes are complete. But if we have somebody who's writing things out, necessarily, it's going to be a summary. So what do we know about how complete the notes were as to what was going on in those meetings? He said that they were not complete. Do we have samples of the notes in the record? I believe that that was due to a problem of our own. Those were not properly authenticated. Didn't Ms. Chan concede that the written summaries were not complete? Yes, they did. In fact, I would say, just point to page 33 of SCS's brief, where they acknowledged that is a problem with note-taking. So they acknowledged that that is a problem in addition to the slowness. Let's explore that a little bit. Accommodations don't have to be a perfect substitute. They often can't be. It's just the nature of the beast. Sometimes the difference between getting pretty good and perfect can be exorbitantly more expensive. We all agree on that. I'm not saying in this case, but just as a general proposition. So following up on Judge Fletcher's question, to say it's not complete doesn't really tell me much. A lot of times it's not complete. Minutes of meetings, so normal minutes that we have, court meetings or something like that, they're never complete. They're always a summary of what happened, and still most of the time they're pretty good. People approve the minutes, sometimes with a few corrections. So not complete doesn't tell me very much. So my question is, to what degree are they incomplete? And I guess the answer is we have some general statements, because we don't have the notes themselves. And, of course, even if we had the notes themselves, we wouldn't have a transcript of the meeting against which to compare. I mean, the standard is, and I would just say two things, well, three things. The standard is that a disabled employee is entitled to equal benefits and privileges of employment, as they're enjoyed by employees who don't have the same disability. I would say that this is summary judgment. So, of course, they're free to argue this at trial. But by equal you don't mean? Identical. Identical, and he doesn't have to. I mean, let's say, for example, which is not the case here, but let's say they've managed to do a verbatim transcript of the meeting and said, look, you don't have to attend. Within 24 hours of the meeting we will give you a verbatim transcript of everything that was said. And what's more, and, again, this is not the facts here, but you know, you then have a couple of days to ask any questions. And just put them in writing. And we'll give you an interpreter to interpret the transcript? I mean, because that's another problem. That's a somewhat different question as to how he reads the notes. Do they have to provide him an interpreter to read the notes? Well, I think what he never asked for an interpreter to interpret the notes from the meeting. What he wanted was an interpreter at the meeting so that he could, because that would be, to be candid, I think that would be silly in a way. It would be much more, if you're going to get an interpreter, have the interpreter be there so that he can be an active participant. Well, but I'm part of the situation where he's not going to the meeting. He's given pretty good notes or perfect notes afterwards. Now, he can say, well, you know, I have a right to be in the meeting, physically present, I shouldn't be excluded from meetings. But he wouldn't take that position, right? He would say as long as he gets the information. It does prohibit segregating and classifying employees based on disability, so I suppose there might be an argument that that might be a form of segregation. I don't think that's... That's not the argument you're making, though. No. The argument we're making is that, at least on summary judgment, it was an error for the court, given the evidence in the record, to hold that it was an effective position. Let's say we rule in your favor, and you go back. How can you reconstruct, I mean, what would the trial of fact look at? I mean, there's no transcripts of the meetings. There's no... Well, there were agendas. There were agendas beforehand. I suppose it would just have to be people talking about the way meetings worked and to what extent did the notes and the agendas written beforehand. So there are notes, you just didn't put them in the record. I believe there are some notes that are not... The district court struck, and we didn't think that was an abuse of discretion. No, but you said there are some that the district court struck. Are there some notes that didn't get struck? I don't believe so. I believe that was a... I don't believe so. So then you're going back, if you're going back, with the ruling that you can't introduce the notes. Well, I think the problem was, it may be, but there are some agendas, I believe, that are still in the record. I don't know to what extent. The problem was a failure to authenticate some of them, and I don't know, to be honest, I don't know whether that corrects it. And in terms of what's in the notes, I assume we'll have Ms. Chang who can testify as to what they were. Right. You would have all these... And we'll get your witness, your, as it were, client. I mean, we can get descriptions of the notes. We just can't get the physical notes. And we can get descriptions of those who both wrote them and read them. Right, and how they... Years ago, right? Be a tough process. Yeah. Okay. Thank you. Okay, thank you. In case you're sorry, you will stand submitted. Thank you, counsel. Illuminating arguments.
judges: Tunheim, Kozinski, Fletcher W.